UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMETTE WILLIAMS, | ) <br> ) <br> ) |
| Plaintiff-Relator, | ) <br> ) |
| v. | ) Case No. 17-cv-00890 (APM) <br> ) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff-Relator Jamette Williams brings both qui tam and retaliation claims against her former employer, Defendant Washington Metropolitan Area Transit Authority ("WMATA"), under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and similar state and District of Columbia statutes. Plaintiff claims that WMATA violated the anti-fraud provisions of these laws by presenting false claims for payment, and that WMATA retaliated against her for reporting alleged violations. WMATA moves to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). WMATA primarily argues that the federal and state qui tam statutes do not apply to it, and that it cannot be sued for retaliation under state law. WMATA also argues that it enjoys immunity from suit for retaliation claims under the federal False Claims Act.

For the reasons that follow, the court grants WMATA's Motion to Dismiss and dismisses this suit in its entirety.

## II. BACKGROUND

### A. Factual Background

#### 1. *Plaintiff's Discovery of Financial Irregularities*

WMATA is an interstate compact funded by the United States; Maryland, Virginia, and the District of Columbia (collectively, "Jurisdictions"); certain counties and cities within Virginia and Maryland; and customer sales. Compl., ECF No. 1, [hereinafter Compl.] ¶ 13. The WMATA Compact is currently codified as D.C. Code § 9-1107.01; Md. Code Ann., Transp. § 10-204; and Va. Code Ann. § 33.2-3100. Plaintiff admits that WMATA "is an agency and instrumentality of DC, Maryland, and Virginia." Compl. ¶ 11.

WMATA employed Plaintiff as a Certified Public Accountant from 2002 to 2016. *Id.* ¶¶ 14, 78. Plaintiff's job consisted of managing and supporting funds transfers, monitoring WMATA's billing, and completing financial reports. *Id.* ¶ 16. Plaintiff also was responsible for providing functional support for the PeopleSoft Financial Suite and allocating the appropriate proportion of public funding for WMATA's projects. *Id.* ¶ 17.

In or around June 2010, WMATA entered into a funding agreement called the Capital Funding Agreement ("CFA"), which provides $5 billion in funds to WMATA's Capital Improvement Plan, a system-wide improvement and maintenance plan. *Id.* ¶¶ 18–19. The CFA provides various grants to WMATA, which are funded in different proportions by the Federal Transit Authority ("FTA"), a federal agency, and each of the Jurisdictions. *Id.* ¶ 20. The CFA requires WMATA to complete a budget reconciliation by October 15th of each year. *Id.* ¶ 21. As part of that process, WMATA's Budget Department is required to produce an annual CFA report, which provides financial information on "actual expenditures on projects and activities; each Jurisdiction's actual and projected allocation contributions, as compared to each Jurisdiction's

scheduled contribution; forecast of expenditures; and the estimated cost to complete remaining projects." *Id.* ¶ 21. The FTA and the Jurisdictions rely on the CFA reports to determine "how much funding is due to [WMATA], and how [WMATA] spent funds in the previous year." *Id.* at ¶ 22. The CFA also identifies surplus funds for reassignment to a different project or refunding to the payor. *Id.*

Beginning in 2012, Plaintiff began noticing problems with financial data contained in the newly upgraded PeopleSoft system. *Id.* ¶¶ 23–24. Those problems included that Jurisdiction-funded grants were not correctly established in the system, meaning that funds were being used in incorrect proportions. *Id.* ¶ 24. She also discovered that WMATA was not reconciling the budget at the end of the fiscal year, "leading to [WMATA]'s withholding of funds that should have been either reassigned to a new project or refunded to the payor government." *Id.* ¶ 25. Plaintiff also noticed that WMATA had requested twice as much funding as necessary for many projects but failed to redistribute or refund the extra money to the FTA. *Id.* ¶ 26.

Plaintiff began raising concerns about WMATA's financial recordkeeping in December 2013. *Id.* ¶ 37. Specifically, she "complained of lack of internal controls between the Budget and Accounting Departments, improper billing adjustments, and duplicate draws from the FTA and Jurisdictions." *Id.* After initially discussing these issues with her supervisor, Ian Greaves, *id.*, Plaintiff met with WMATA's General Counsel Kathryn Pett as part of a whistleblower investigation by the U.S. Department of Justice ("DOJ") in February 2014, *id.* ¶ 38. Plaintiff voiced concerns and shared files with Pett during this meeting, *id.*, and Pett forwarded the information to the Managing Director, Office of Management and Budget, Tom Webster, *id.* ¶ 39. According to Plaintiff, Webster took no action on her concerns. *Id.* As a result of the DOJ investigation, FTA placed WMATA on a "draw restriction." *Id.* ¶ 40. Plaintiff met with

WMATA's Deputy Chief Financial Officer ("CFO") Blair Fishburn to review reconciliations she had developed and to show him duplicate draws, but Fishburn also failed to take corrective action. *Id.* ¶ 42.

In August 2014, WMATA's Office of the Inspector General began investigating WMATA's failure to complete CFA reports in FY2013 and FY2014. *Id.* ¶ 43. Plaintiff met with investigators and shared her concerns about the integrity of the PeopleSoft financial data, which she believed "inevitably led to inaccurate CFA reports." *Id.* ¶ 45. Soon afterward, in October 2014, WMATA's new CFO Dennis Anosike asked Plaintiff to prepare a list of the Accounting Department's responsibilities, and she sent him a list of tasks that "that needed to be performed to ensure the accuracy and integrity of the data used for both the annual CFA report and the Schedule of Expenditures of Federal Awards." *Id.* ¶ 47. Later, Plaintiff notified Anosike about a "black hole," a term used to signify expenditures that had not been assigned to a funding source within the grants management system. *Id.* ¶ 49. Anosike took no action in response to Plaintiff's communications. *Id.* ¶¶ 48–49.

WMATA's accounting issues continued into the next fiscal year. Plaintiff alleges that in FY2015, WMATA "failed to record several invoices for reimbursement to the FTA in PeopleSoft," resulting in $86 million inaccurately accumulated as a credit on WMATA's balance sheets. *Id.* ¶ 50. WMATA also did not redistribute FTA funds between July and December 2014, resulting in a $290 million deficiency in funding for all projects. *Id.* ¶ 52.

In the end, Plaintiff claims that between 2012 and 2016, WMATA failed to properly bill $1.1 billion, approximately $700 million of which came from the Jurisdictions and $414 million of which came from the FTA. *Id.* ¶ 53.

### 2. *WMATA Retaliates against Plaintiff*

In November 2014, Plaintiff had several interactions with her first-line supervisor, Ian Greaves, concerning the purposeful manipulation of financial data by WMATA's employees and the magnitude of the inaccuracies. *Id.* ¶¶ 54–55. Greaves responded to one such conversation on November 24, 2014, by stating, "man you should see the emails coming and going from [CFO] Dennis [Anosike] . . . I know is [sic] after me just like he is with you and other people." *Id.* ¶ 56.

In April 2015, the Office of Inspector General released a summary report, titled "Review of WMATA's Local Jurisdictional Subsidies." *Id.* ¶ 57. The report made two key findings: "(a) that [WMATA] failed to prepare or distribute CFA reports since FY2012, and (b) that the CFA provisions authorizing the Jurisdictions to perform an external audit had not been consistently exercised." *Id.* ¶ 58. Yet, in Plaintiff's view, the report "understated the magnitude of [WMATA]'s financial and accounting abuse and fraud," because it did not address WMATA's "duplicate draws from the FTA, withholding of government funds, fraudulent reconciliation of accounts, or failure to ensure compliance with funding requirements." *Id.* ¶ 59. WMATA responded to the report by promising to "fully draw and close prior years' grants, and ensure the accurate reconciliation of accounts." *Id.* ¶¶ 60–61. When WMATA failed to implement changes, Plaintiff registered complaints with management. *Id.* ¶ 62.

On August 15, 2015, Plaintiff met with WMATA's Manager of Employee Relations, Michelle Chapman, to complain about retaliation. *Id.* ¶ 63. Specifically, she protested that the CFO had instructed her to complete the CFA report for FY2014, even though doing so meant relying on "inaccurate data" from FY2013. *Id.* ¶ 64. Plaintiff nevertheless completed the report on or around December 30, 2015. *Id.* ¶ 67. At some point in December 2015, Plaintiff met with the Office of Inspector General and reported that WMATA "had forced her to complete the

FY2014 CFA report using data that [WMATA] knew was materially inaccurate" and "asked her [ ] to fraudulently manipulate data to make Defendant's accounts appear balanced." *Id.* ¶¶ 69–70.

On January 28, 2016, WMATA completed Plaintiff's annual performance evaluation, in which it criticized Plaintiff for having "failed to manage the productivity towards the completion of the [CFA] report." *Id.* ¶ 71. WMATA placed Plaintiff on a Performance Improvement Plan ("PIP") on February 2, 2016, which required her to complete the FY2015 CFA report by February 12, 2016. *Id.* ¶¶ 72–73.

Plaintiff then filed two separate internal complaints with WMATA. The first, filed on March 8, 2016, was an internal whistleblower retaliation complaint alleging that the FY2014 CFA report contained material inaccuracies and that WMATA put Plaintiff on a PIP in retaliation for pointing this out. *Id.* ¶ 76. The second internal grievance, filed on May 6, 2016, accused WMATA of putting Plaintiff on a PIP to blame her for WMATA's erroneous financial reporting and management system. *Id.* ¶ 77. On May 27, 2016, WMATA terminated Plaintiff's employment, stating that she had failed to meet the PIP requirements. *Id.* ¶ 78. On November 18, 2016, WMATA issued a decision on Plaintiff's internal complaint of retaliation, finding that it did not retaliate against Plaintiff. *Id.* ¶ 79.

B.  **Procedural Background**

Plaintiff filed this suit on May 12, 2017, alleging that WMATA (1) presented false claims for payment to the FTA and the Jurisdictions, and (2) retaliated against her for complaining about WMATA's fraudulent billing practices. *See generally* Compl. Plaintiff's Complaint asserts claims under the qui tam and retaliation provisions of (1) the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") (Counts 1 through 5); (2) the Maryland False Claims Act, Md. Code Ann. §§ 8-101, *et seq.* (Counts 6 and 7); (3) the Virginia Fraud Against Taxpayers Act, Va. Code

Ann. §§ 8.01-216.1, *et seq.* (Counts 8 and 9); and (4) the District of Columbia False Claims Act, D.C. Code §§ 2-308.13, *et seq.* (Counts 10 and 11). Plaintiff also advances a claim under the Employees of District Contractors and Instrumentality Whistleblower Protection Act of 1988, D.C. Code §§ 2-223, *et seq*. (Count 12). Compl. ¶¶ 82–176. As required by the FCA, Plaintiff filed her Complaint under seal and served it upon the United States to afford it the opportunity to investigate the basis of her claim and to decide whether to intervene. *See* 31 U.S.C. § 3730(b).

On July 18, 2018, the District of Columbia and the Commonwealth of Virginia notified the court that each declined to intervene in this action. *See* Notice of Election to Decline Intervention, ECF No. 8. The United States did the same two days later, on July 20, 2018. *See* Notice of Election to Decline Intervention, ECF No. 11. On July 24, 2018, the court unsealed the Complaint and ordered service upon WMATA. *See* Order, Jul. 24, 2018, ECF No. 12. Subsequently, on August 17, 2018, the State of Maryland notified the court that it also declined to intervene in this action. *See* Notice of Election to Decline Intervention, ECF No. 16.

WMATA then filed this Motion to Dismiss on October 4, 2018. *See* Def.'s Mot. to Dismiss Pl.-Relator's Compl., ECF No. 23 [hereinafter Def.'s Mot.].[1] Plaintiff opposed the Motion to Dismiss in large part, but voluntarily dismissed (1) her qui tam and retaliation claims under the Maryland False Claims Act (Counts 6 and 7); (2) her qui tam claim under the Virginia Fraud Against Taxpayers Act (Count 8); and (3) her claim under the District of Columbia Whistleblower Protection Act (Count 12). *See* Pl.'s Opp'n to Def.'s Mot., ECF No. 27 [hereinafter Pl.'s Opp'n], at 13 n.5. Thus, what remains are qui tam and retaliation claims under the FCA and the District of Columbia equivalent and a retaliation claim under Virginia law.

---

[1] Because WMATA has combined its motion to dismiss and memorandum of points and authorities in a single filing, the court uses the ECF-generated page number when referencing WMATA's briefing.

## III. LEGAL STANDARD

WMATA moves to dismiss under both Rules 12(b)(1) and 12(b)(6). When deciding a motion under Rule 12(b)(1), a court must accept all well-pleaded factual allegations in the complaint as true. *See Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005). Additionally, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks and citation omitted). The court presumes that it lacks subject matter jurisdiction, "unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991). The plaintiff bears the burden of establishing the court's subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To withstand a motion to dismiss under Rule 12(b)(6), the court must find that the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Naked assertion[s] devoid of further factual enhancement" are not sufficient to support a complaint. *Id.* (alteration in original) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). Factual allegations are not required to be "detailed," but pursuant to the Federal Rules, they must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

show[n]– that the pleader is entitled to relief," and the case can be dismissed. *Id.* at 679 (alteration in original) (internal quotation marks omitted) (citing Fed. R. Civ. P. 8(a)(2)).

IV. ANALYSIS

The court begins by addressing Plaintiff's qui tam claims under the FCA and District of Columbia law. The court then turns to Plaintiff's federal and state retaliation claims.

A. Qui Tam Claims

1. FCA Qui Tam Claims

WMATA's primary argument for dismissal of Plaintiff's FCA qui tam claim is that WMATA is not a "person" subject to suit under the FCA.[2] The FCA subjects to civil liability "any person" who submits various kinds of false or fraudulent claims to the United States. 31 U.S.C. § 3729(a)(1). The statute does not define the term "person." Thus, the plain text of the FCA leaves unaddressed whether it reaches an interstate compact entity, like WMATA.

Case law supplies the answer, however. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, the Court held that neither States nor their agencies are "persons" for purposes of the qui tam provision of the FCA. 529 U.S. 765, 787–88 (2000). Although *Stevens* left unanswered how courts should go about deciding whether an entity qualifies as a state agency, lower courts uniformly have used the "arm of the state" test used in the sovereign immunity context to make that determination. *See, e.g.*, *United States & Commonwealth of Mass., ex rel. Willette v. Univ. of Mass., Worcester*, 812 F.3d 35, 39 (1st Cir.) (citing cases), *cert. denied*, 137 S. Ct. 617 (2017). The D.C. Circuit has identified three relevant factors to consider when making the arm-of-the-state

---

[2] WMATA also argues that the court should dismiss Plaintiff's qui tam claims—both federal and state—because they are jurisdictionally foreclosed by the "public disclosure" bar. Def.'s Mot. at 18. The court cannot find in favor of WMATA as to that contention at the motion-to-dismiss stage. Taking the facts in the light most favorable to Plaintiff, the Office of Inspector General report that WMATA asserts constitutes the "public disclosure," *see* Def.'s Mot. at 19, does not address, among other things, the accounting irregularities that lie at the heart of Plaintiff's Complaint. *See U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 41 (D.C. Cir. 2014) (rejecting application of public disclosure bar).

inquiry: "(1) the State's intent as to the status of the entity, including the functions performed by the entity; (2) the State's control over the entity; and (3) the entity's overall effects on the state treasury." *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873 (D.C. Cir. 2008). Taken together, these three factors focus on the "nature of the entity created by state law" and whether the State "structured" the entity to share in the State's immunity from suit. *Id.* (citation omitted).

On the question of whether WMATA qualifies as an arm of the state, the court does not write on a clean slate. The D.C. Circuit already has performed an arm-of-the-state analysis and concluded that WMATA so qualifies. *See Morris v. WMATA*, 781 F.2d 218, 219–20 (D.C. Cir. 1986). First, based on the text of the Compact, the court in *Morris* observed that "it is absolutely clear that Maryland, Virginia, and the Congress of the United States intended that WMATA should receive the eleventh amendment immunity of the states." *Id.* at 225. As to the second factor, the court explained that "Maryland and Virginia exercise a high degree of control over WMATA" because of WMATA's governance structure, as well as the requirement that the agency's rules and regulations must be consistent with state laws. *Id.* at 227. Finally, because WMATA is not financially self-sustaining and relies on federal and local funding to maintain its operations, the court stated that "[i]t is clear that the practical result of a judgment against WMATA here would be payment from the treasuries of Maryland and Virginia." *Id.* at 225. In sum, the court in *Morris* found that all three arm-of-the-state factors "point[] to the existence of immunity" for WMATA. *Id.* at 228. Those same three factors, therefore, make clear that WMATA is not a "person" for purposes of the FCA.

To avoid this result, Plaintiff makes two arguments, neither of which are convincing. First, Plaintiff contends that, because the District of Columbia can be sued under the FCA, so too can WMATA. *See* Pl.'s Opp'n at 5–6. Putting to the side the fact that it remains *unresolved* whether

the District of Columbia can be sued under the FCA, *see United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143, 149–50 (D.D.C. 2017), Plaintiff's contention is squarely foreclosed by *Morris*. The court there flatly rejected the assertion that "the District of Columbia's participation in creating WMATA destroys WMATA's immunity from suit." 781 F.2d at 228. Plaintiff cannot resuscitate an argument rejected by the Circuit long ago.

Next, Plaintiff urges the court to allow the parties to engage in discovery to help determine if WMATA is an arm of the state in the context of *this case*. *See* Pl.'s Opp'n at 6–9. But Plaintiff's appeal for discovery misapprehends the court's analysis in *Morris*. There, the court found WMATA to be an arm of the state based on the text of the Compact, WMATA's governance structure, and the multi-jurisdictional manner of funding WMATA. Nothing about the court's analysis suggests that its conclusion was case specific. In any event, Plaintiff points to no conceivable change in any of those factors in the over three decades since the Circuit decided *Morris* to justify discovery. *Cf. Convertino v. U.S. Dep't. of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). Accordingly, because WMATA is not a "person" for purposes of the FCA in this qui tam action, Counts 1 through 4 are dismissed.[3]

*     *     *

Before proceeding, the court makes clear the limited nature of its holding. In a Statement of Interest filed with the court, the United States asks that the court limit its dismissal of Plaintiff's FCA claim to "the facts of this case, which presents only the issue of whether a private individual .

---

[3] Plaintiff also maintains that WMATA "does not and cannot raise an alternative argument that sovereign immunity excuses its alleged violations of the qui tam provisions of the FCA." Pl.'s Opp'n at 11. That contention is a red herring. WMATA does not argue it is immune from suit under the qui tam provision of the FCA, only that it is not a "person." Because the court agrees with WMATA that it is not a "person," the court need not address the question of whether WMATA is immune from suit under the Eleventh Amendment. *See Vermont Agency of Nat. Resources*, 529 U.S. at 779 (explaining, when declining to first address the issue of sovereign immunity, that we "routinely [have] addressed before the question whether the Eleventh Amendment forbids a particular statutory cause of action to be asserted against States, the question whether the statute itself permits the cause of action it creates to be asserted against States (which it can do only by clearly expressing such an intent)").

. . may bring claims against WMATA in a declined FCA case." U.S. Stmt. of Interest, ECF No. 25, at 4. The court sees no reason to decide at this juncture whether the United States' participation in an FCA case would alter the analysis of WMATA's personhood, and therefore limits this decision only to those cases, as here, where the relator alone is prosecuting the qui tam action.

2. *Whether WMATA Is Subject to Suit Under the DCFCA*

The question remains whether WMATA is subject to suit under the DCFCA, Plaintiff's only remaining qui tam claim. It is not. This District Court has long recognized that "pursuant to the WMATA Compact, one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and of the Congress of the United States." *Lucero-Nelson v. WMATA*, 1 F. Supp. 2d 1, 7 (D.D.C. 1998); *see also Office & Prof'l Employees Int'l Union, Local 2 v. WMATA*, 724 F.2d 133, 139 (D.C. Cir. 1983) ("[T]he Compact itself limits the effect of other statutes.") (citing D.C. Code § 9-1107.01, section 77). Plaintiff does not contend that any of the other jurisdictions, including the United States, have affirmatively agreed to subject WMATA to the DCFCA. Rather, she argues that, because "[e]ach signatory to the WMATA Compact created its own version of the FCA, . . . they have consented to imposing legislative enactment upon one another." Pl.'s Opp'n at 13. Plaintiff cites no case for this proposition. That is not a surprise. In the face of an express agreement among the signatories of the Compact to limit the laws to which WMATA is subject, the mere fact that each jurisdiction has its "own version of the FCA" does not imply tacit agreement for WMATA to be bound by those statutes. *Cf. Slack v. WMATA*, 325 F. Supp. 3d 146, 156 (D.D.C. 2018) ("But where each jurisdiction has enacted a different statute, the fact that the statutes address the same subject matter only increases the likelihood that applying one jurisdiction's laws to WMATA could upset the

other jurisdictions' policy judgments."). WMATA therefore is not subject to suit under the DCFCA. Count 10 is dismissed.[4]

### B. Retaliation Claims

#### 1. *FCA Retaliation Claim*

The court turns now to Plaintiff's retaliation claim under the FCA. WMATA's sole argument is that sovereign immunity bars that claim. *See* Def.'s Mot. at 20–22. To support its argument, Defendant relies on *Slack v. WMATA*, in which Judge McFadden held the FCA's retaliation provision does not expressly abrogate state sovereign immunity and therefore WMATA is immune from such claim. *See Slack*, 325 F. Supp. 3d at 153. The court agrees with Judge McFadden's bottom-line conclusion and supplements his analysis as follows.[5]

The D.C. Circuit has recognized that the signatories of the WMATA Compact intended to confer their governmental immunity upon WMATA. *See Dant v. District of Columbia*, 829 F.2d 69, 74 (D.C. Cir. 1987) (citing *Morris*, 781 F.2d at 222). But, that waiver is not absolute. "[S]ection 80 of the Compact waives WMATA's immunity for torts committed in the exercise of its 'proprietary' functions, but not for WMATA's 'governmental' conduct." *Id.*; *see also Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997). The D.C. Circuit has held that "decisions

---

[4] Alternatively, WMATA argues that it is not a "person" for purposes of the DCFCA. *See* Def.'s Mot. at 14–15 (D.C. Code § 2-381.02(a)). The court agrees. *See Grayson v. AT & T Corp.*, 140 A.3d 1155, 1163 n. 24 (D.C. 2011) (stating that "it is appropriate to turn to both California and federal cases for guidance in interpreting the [DC]FCA"). The court does not, however, reach WMATA's additional contention that dismissal of the FCA qui tam claims is warranted for failure to plead fraud with particularity. *See* Def.'s Mot. at 24–27.

[5] Despite Slack's finding that "the FCA leaves WMATA's sovereign immunity intact," *id.*, Plaintiff argues that *Slack* does not apply to the instant case because "*Slack* analyzed whether the FCA abrogated **state** sovereign immunity, but did not address whether the FCA abrogated WMATA's immunity, specifically, Pl.'s Opp'n at 9 (citing *Slack,* 325 F. Supp. 3d at 152) (emphasis in original). This argument is nonsensical. Slack explicitly analyzed "whether [the plaintiff had] shown an abrogation or waiver of WMATA's sovereign immunity from suit under the False Claims Act," *Slack,* 325 F. Supp. 3d at 151-52, and found that "Congress did not abrogate WMATA's sovereign immunity by passing the FCA," and that there was no evidence before the court that WMATA had "waived its immunity from private FCA claims," *id.* at 155.

13

concerning the hiring, training, and supervising of WMATA employees are discretionary in nature"—therefore, falling on the governmental function side of the ledger—"and thus immune from judicial review." *Burkhart v. WMATA*, 112 F.3d 1207, 1216–17 (D.C. Cir. 1997); *see also Beebe*, 129 F.3d at 1287. In so holding, the court in *Burkhart* observed that "[t]he WMATA compact confers upon WMATA *broad power* to '[c]reate *and abolish* . . . employments" and "provide for the qualification, appointment, [and] *removal* . . . of its . . . employees without regard to the laws of *any* of the signatories," D.C. Code § [9-1107.01(12)(g)]; "[e]stablish, in its discretion, a personnel system based on merit and fitness," *id.* § [9-1107.01(12)(h)]; and "[c]ontrol and regulate . . . the service to be rendered," *id.* § [9-1107.01(12)(j)]." *Burkhart*, 112 F.3d at 251 (emphases added). The court surmised: "These provision[s] hardly constrain WMATA's determination of whom it will employ or how it will train and supervise such employees. Thus, WMATA has choices to make." *Id.* The court in *Burkhart* therefore held that WMATA was immune from the plaintiff's negligent hiring, training, and supervision claims. *See id.* The Circuit extended that decision in *Beebe*, finding WMATA immune from various other tort claims arising out of an employment decision, including intentional torts. *See Beebe*, 129 F.3d at 1288.

Applying *Burkhart* and *Beebe* here, the court concludes that WMATA's firing of an employee in alleged violation of the FCA's anti-retaliation provision qualifies as a "government function" that is not subject to judicial review. This case is like *Morris*, in which the Circuit held that WMATA was immune from a former police officer's suit alleging termination in retaliation for past statements asserting race discrimination against him and other black officers in violation of 42 U.S.C. § 1983. *See Morris*, 781 F.2d at 220. Plaintiff says *Morris* is different, because it involved WMATA's operation of a police force, a quintessential government function. *See* Pl.'s Opp'n at 5. But that distinction is one without a difference. WMATA's accounting of taxpayer

14

funds used towards its capital improvement program is no less a government function than is the running of a police force. Moreover, as the Circuit recognized in *Burkhart* and *Beebe*, WMATA enjoys "broad power" to "remove" employees "without regard to the law of any of its signatories." *Burkhart*, 112 F.3d at 251 (quoting D.C. Code § 1-2431(12)(g)). Here, WMATA is alleged to have terminated Plaintiff for "fail[ing] to meet the PIP requirements," which included completing the FY2015 CFA Report by a certain date. Compl. ¶¶ 73, 76. "The FTA and the Jurisdictions rely on the CFA reports to determine how much funding is due to [WMATA], and how [WMATA] spent funds in the previous year." *Id.* ¶ 22. Put simply, WMATA is alleged to have fired Plaintiff for failing to perform a governmental function. Accordingly, WMATA is immune from suit under the anti-retaliation provision of the FCA. Count 5 is thus dismissed.

### 2. DCFCA and Virginia FCA Retaliation Claims

That leaves Plaintiff's retaliation claims arising under the DCFCA and the Virginia FCA. For the reasons already discussed, WMATA is not subject to suit under those statutes because its signatories did not agree to be subject to those laws. Counts 9 and 11 likewise are dismissed.

## V. CONCLUSION

For the foregoing reasons, WMATA's Motion to Dismiss is granted. Plaintiff's Complaint and this action are dismissed in their entirety.

A separate final order accompanies this Memorandum Opinion.

Dated: May 9, 2019

Amit P. Mehta
United States District Judge

15